991 So.2d 337 (2008)
James HITCHCOCK, Appellant,
v.
STATE of Florida, Appellee.
James E. Hitchcock, Petitioner,
v.
Walter A. McNeil, etc., Respondent.
Nos. SC03-2203, SC04-1286.
Supreme Court of Florida.
May 22, 2008.
Rehearing Denied September 17, 2008.
*342 Bill Jennings, Capital Collateral Regional Counsel, and James L. Driscoll, Jr. and Eric C. Pinkard, Assistant CCR Counsel, Middle Region, Tampa, Florida, for Appellant/Petitioner.
Bill McCollum, Attorney General, Tallahassee, Florida, and Kenneth S. Nunnelley, Senior Assistant Attorney General, Daytona Beach, Florida, for Appellee/Respondent.
PER CURIAM.
James Ernest Hitchcock appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.850 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

I. FACTUAL AND PROCEDURAL BACKGROUND
Hitchcock was convicted and sentenced to death for the 1976 strangulation murder of his brother's thirteen-year-old stepdaughter. The facts in this case are set forth in detail in Hitchcock v. State, 413 So.2d 741 (Fla.1982) (Hitchcock I), cert. denied, 459 U.S. 960, 103 S.Ct. 274, 74 L.Ed.2d 213 (1982). This Court affirmed Hitchcock's conviction and sentence. Id. Thereafter, this Court affirmed the denial of Hitchcock's motion for postconviction relief. Hitchcock v. State, 432 So.2d 42 (Fla.1983) (Hitchcock II). In later federal habeas corpus proceedings, the United States Supreme Court granted certiorari and vacated Hitchcock's death sentence because the advisory jury was instructed not to consider and the sentencing judge refused to consider evidence of nonstatutory mitigating circumstances. Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). On remand, the jury again recommended the death penalty, which the trial judge subsequently imposed. This Court affirmed the sentence. *343 Hitchcock v. State, 578 So.2d 685 (Fla. 1990) (Hitchcock III), cert. denied, 502 U.S. 912, 112 S.Ct. 311, 116 L.Ed.2d 254 (1991). On rehearing, the United States Supreme Court granted certiorari and remanded to this Court for reconsideration in light of Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). See Hitchcock v. Florida, 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992). On remand, we vacated Hitchcock's death sentence and directed the trial court to empanel a jury and conduct a new penalty proceeding within ninety days. Hitchcock v. State, 614 So.2d 483 (Fla.1993) (Hitchcock IV). In Hitchcock's second resentencing proceeding, the jury recommended the death penalty, which the trial judge subsequently imposed. We again remanded for resentencing because evidence portraying Hitchcock as a pedophile was erroneously made a feature of his resentencing proceeding. Hitchcock v. State, 673 So.2d 859 (Fla.1996) (Hitchcock V).
In Hitchcock's third resentencing proceeding, the jury recommended the death penalty by a vote of ten to two. The trial court followed the recommendation, finding four aggravating circumstances: (1) the crime was committed while Hitchcock was under a sentence of imprisonment; (2) he committed the crime while he was engaged in the enumerated felony of sexual battery; (3) he committed the crime for purpose of avoiding or preventing a lawful arrest; and (4) the crime was especially heinous, atrocious, or cruel (HAC). The court found one statutory mitigating factor: Hitchcock was young, twenty years of age, at the time of the murder. The court also found twenty-three nonstatutory mitigating circumstances, divided among the following three categories: (1) there were mitigating circumstances concerning the crime;[1] (2) there were adverse features in Hitchcock's background;[2] and (3) Hitchcock had positive character traits.[3]State v. Hitchcock, No. CR 76-1942 (Fla. 9th Cir. Ct. amended sentencing order filed October 8, 1997) (Sentencing Order). Hitchcock appealed his death sentence, asserting eighteen claims. This Court affirmed, finding that all of the claims were procedurally barred or without merit. Hitchcock v. State, 755 So.2d 638 (Fla. 2000) (Hitchcock VI), cert. denied, 531 U.S. 1040, 121 S.Ct. 633, 148 L.Ed.2d 541 *344 (2000).[4]
Hitchcock filed the instant motion for postconviction relief in 2001, raising thirteen claims.[5] The circuit court conducted an evidentiary hearing on this motion from April 7 through April 10, 2003, which was continued on May 8, 2003. In an October 27, 2003, order, the circuit court denied as procedurally barred each of Hitchcock's claims related to the 1977 guilt phase of his trial and denied each of Hitchcock's claims related to his 1996 resentencing on their merits. State v. Hitchcock, No. CR76-1942 (Fla. 9th Cir. Ct. order filed October 27, 2003) (Postconviction Order I). Hitchcock appealed the circuit court's denial of the motion, raising eleven issues.[6] *345 Hitchcock also petitioned this Court for a writ of habeas corpus, raising six issues.[7]
On March 10, 2005, this Court held oral argument on Hitchcock's postconviction and habeas claims. We determined that the circuit court erred in ruling that the claims relating to the 1977 guilt phase were procedurally barred. We temporarily relinquished jurisdiction to the circuit court for an evidentiary hearing and a ruling on the merits of Hitchcock's guilt-phase issues and newly discovered evidence claims. Hitchcock v. State, No. SC03-2203 (Fla. order filed May 3, 2005). Pursuant to this Court's order, the circuit court considered the evidence presented and proffered in the 2003 evidentiary hearing regarding Hitchcock's guilt-phase claims and conducted a two-part hearing on November 15, 2005, and December 7, 2005, during which the parties presented additional evidence. On March 29, 2006, the circuit court issued an order denying relief on Hitchcock's guilt-phase and newly discovered evidence claims. State v. Hitchcock, No. CR76-1942 (Fla. 9th Cir. Ct. order filed March 29, 2006) (Postconviction Order II). We now consider Hitchcock's remaining issues on appeal and his petition for a writ of habeas corpus.

II. RULE 3.850 MOTION FOR POSTCONVICTION RELIEF

A. Guilt-Phase Claims

1. Character Evidence Regarding James and Richard Hitchcock
Hitchcock argues that his guilt-phase counsel was ineffective for opening *346 the door to admission of negative character evidence about Hitchcock and for failing to secure admission of negative character evidence about his brother, Richard Hitchcock. In order to prove ineffective assistance of counsel, Hitchcock must demonstrate both that counsel's performance was deficient and that the deficiency caused prejudice. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To be deficient, the attorney's performance must fall below an objective standard of reasonableness based on prevailing professional norms. Cherry v. State, 781 So.2d 1040, 1048 (Fla.2000). The standard for prejudice is a reasonable probability that but for counsel's deficiency, the result of the trial would have been differentthat is, a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 694, 104 S.Ct. 2052; Cherry, 781 So.2d at 1048. Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla. 2004).
First, Hitchcock argues that Charles Tabscott, his guilt-phase counsel, was ineffective because Tabscott put Hitchcock's reputation at issue and thereby allowed negative character evidence about Hitchcock to be introduced. Tabscott called several witnesses to offer evidence of Hitchcock's good character. In response, the State called Judy Hitchcock, the victim's mother, who testified that Hitchcock physically attacked his ex-girlfriend and that he did not have a good reputation. The State also called Richard Hitchcock who testified that Hitchcock "stayed in trouble all the time" when he lived in Arkansas. Hitchcock asserts that his counsel was ineffective because the testimony of the defense witnesses was not entirely positive and the testimony of Judy Hitchcock, Richard Hitchcock, and Hitchcock's ex-girlfriend was devastating to his defense. Hitchcock argues that had counsel adequately consulted with him regarding the likely testimony of the witnesses, counsel could have avoided opening the door to prejudicial testimony.[8]
The circuit court denied this claim. The circuit court concluded that "[d]efendant's allegations lack sufficient credibility or in the alternative, they are conclusively refuted by the record for the reasons which follow." The circuit court then recited a list of actions taken by counsel during trial that indicated that he did prepare for trial and that he did consult with Hitchcock regarding his defense. The circuit court held that Judy Hitchcock's testimony that Hitchcock physically attacked his girlfriend did not prejudice Hitchcock because the girlfriend later testified that "there was no reason to be afraid of [Hitchcock]." The circuit court did not specifically address Judy Hitchcock's testimony that Hitchcock did not have a good reputation and Richard Hitchcock's testimony that Hitchcock was frequently in trouble.
*347 We agree that Hitchcock is not entitled to relief on this claim. During the postconviction evidentiary hearing, Tabscott testified that he was familiar with the concept of opening the door to character evidence. When asked whether he may have opened the door at trial, Tabscott responded:
I suppose twenty-six years later you could review the transcript and say that. But I remember that we were in a very desperate situation which as I recall Mr. Hitchcock had confessed to murdering and raping a thirteen year old child. And I think we were in a position of doing whatever we could to number one, try to get the jury to feel that there was reasonable doubt as to guilt and number two, save him from the death penalty. So if you call that opening the door, I suppose it's possible that a door was opened. I certainly would not have developed these witnesses on my own. It would have come from Mr. Hitchcock.
The record indicates that Tabscott made a strategic decision to put Hitchcock's character at issue. In light of Hitchcock's initial confession, defense counsel essentially had no choice but to put Hitchcock on the stand to explain his recantation, thus putting Hitchcock's credibility and, indirectly, his character at issue. Defense counsel offered testimony by friends and family to bolster Hitchcock's credibility and reputation. Counsel is not ineffective for adopting reasonable strategies, even if in retrospect those strategies appear unadvisable. See Patton v. State, 878 So.2d 368, 373 (Fla.2004) (finding counsel's decision to limit use of voluntary intoxication defense in order to disassociate defendant from drug abuse was reasonable and not ineffective); Howell v. State, 877 So.2d 697, 705 (Fla.2004) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight ... and to evaluate the conduct from counsel's perspective at the time." (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052)).
Second, Hitchcock argues that Tabscott was ineffective because he failed to successfully present incriminating evidence showing that his brother Richard had committed acts of violence against other young female family members that were strikingly similar to the murder of Cynthia Driggers. Again, we find no basis to reverse the trial court because the record refutes Hitchcock's claim.
Hitchcock's defense was that Richard committed the murder. Tabscott attempted to introduce evidence regarding Richard's violent tendencies in support of this defense theory. Specifically, he attempted to ask Brenda Hitchcock (now Brenda Reed), Martha Hitchcock, James Hitchcock, and Fay Hitchcock whether they had known Richard to be violent. The State objected on relevance grounds, and the trial court sustained the objections. Later, counsel asked to proffer the testimony of these witnesses to demonstrate their relevancy:
My proffer will be to the effect, that I will call members of the family that I previously called to establish that they do know Richard Hitchcock to have a violent nature, and a violent reputation. And also, that Richard Hitchcock had made sexual advances towards two sisters. They would so testify, Brenda Hitchcock and Martha Hitchcock.
The trial court denied the proffer and refused to admit the testimony. On direct appeal, this Court affirmed the trial court's decision to exclude the evidence. See Hitchcock I, 413 So.2d at 744 (holding that testimony regarding Richard's alleged bad acts and violent propensities was not admissible as impeachment evidence and too *348 attenuated to be relevant to whether Richard committed the murder).
Since counsel did attempt to introduce the incriminating evidence about Richard, the question of deficiency revolves around how much counsel could have been reasonably expected to push for the admissibility of that evidence. Hitchcock argues that the evidence regarding Richard's sexual violence would have been admissible under Williams v. State, 110 So.2d 654 (Fla. 1959), had counsel argued this point, because it would have proved Richard's motive to kill the victim, his bias in testifying against his brother, and his modus operandi in acting violently against young women. Hitchcock argues that Richard's conduct reflects a clear pattern of claiming ownership over young female family members, including a tendency to become violent and choke the women when they did not submit.
Hitchcock's argument fails because this Court did not hold that Williams rule evidence could be used by defendants to incriminate other suspects until 1990, long after Hitchcock's trial. See Rivera v. State, 561 So.2d 536 (Fla.1990); State v. Savino, 567 So.2d 892 (Fla.1990). This Court has "consistently held that trial counsel cannot be held ineffective for failing to anticipate changes in the law." Cherry, 781 So.2d at 1053. A defendant's ability to exploit the Williams exception had not become an established aspect of Florida law at the time of Hitchcock's trial. Thus, Tabscott's performance did not fall below the objective standard of prevailing professional norms, and Hitchcock is not entitled to relief on this claim.

2. Destruction of Evidence Claim
Hitchcock argues that the State destroyed exculpatory physical evidence, including hairs, blood samples, and clothing that, if subjected to DNA testing and hair comparison, could have been used to implicate Richard and exonerate Hitchcock. Hitchcock admits that this Court has already concluded that DNA testing would not exonerate Hitchcock, see Hitchcock VII, but argues that this Court should nevertheless order DNA testing of the hair samples in light of the postconviction evidence that the original hair analysis may have been flawed.
We agree with the circuit court's finding that Hitchcock has not demonstrated how DNA testing would result in newly discovered evidence likely to produce an acquittal on retrial. DNA analysis of the pubic hairs found on the victim would not exonerate Hitchcock because he admitted having sexual intercourse with her. DNA analysis of the non-pubic hairs found on the victim is also not likely to exonerate Hitchcock because the victim and Richard lived in the same household. Shared living space provides a reasonable, innocent explanation for the presence of Richard's hairs on the victim's body. See King v. State, 808 So.2d 1237, 1247 (Fla.2002).
Hitchcock also claims that to the extent that the evidence is unavailable for testing, such destruction of evidence is a violation of his constitutional rights. "The loss or destruction of evidence that is potentially useful to the defense violates due process only if the defendant can show bad faith on the part of the police or prosecution." Guzman v. State, 868 So.2d 498, 509 (Fla.2003) (citing Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)). In his second amended motion, Hitchcock failed to allege bad faith or any facts that would support such an allegation. Therefore, his claim is legally insufficient.

3. Newly Discovered Evidence of Hitchcock's Innocence
Hitchcock argues that testimony presented at the postconviction evidentiary *349 hearing is newly discovered evidence which demonstrates his innocence and merits a new trial. To obtain a new trial based on newly discovered evidence, a defendant must demonstrate that: (1) the evidence was not known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence; and (2) the newly discovered evidence is of such nature that it would probably produce an acquittal on retrial. See Jones v. State, 709 So.2d 512, 521 (Fla.1998) (Jones II). Newly discovered evidence satisfies the second prong of the Jones II test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Jones II, 709 So.2d at 526 (quoting Jones v. State, 678 So.2d 309, 315 (Fla.1996)). In determining whether the evidence compels a new trial, the trial court must "consider all newly discovered evidence which would be admissible" and must "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." Jones v. State, 591 So.2d 911, 916 (Fla.1991) (Jones I).
When the trial court rules on a newly discovered evidence claim after an evidentiary hearing, we accept the trial court's findings on questions of fact, the credibility of witnesses, and the weight of the evidence if based upon competent, substantial evidence. Melendez v. State, 718 So.2d 746, 747-48 (Fla.1998); Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997). As with rulings on other postconviction claims, we review de novo the trial court's application of the law to the facts. Cf. Hendrix v. State, 908 So.2d 412, 423 (Fla. 2005) (reviewing de novo trial court's application of law to claim that government withheld material evidence); Gore v. State, 846 So.2d 461, 468 (Fla.2003) (reviewing de novo application of law to facts on claim of ineffective assistance of trial counsel).
Throughout the briefing of this issue, Hitchcock refers to the evidence of Richard's physical and sexual abuse of female relatives as newly discovered evidence. This argument is procedurally barred because Hitchcock did not raise it in his postconviction motion. See Green v. State, 975 So.2d 1090, 1104 (Fla.2008) ("This claim is procedurally barred because it was neither raised in Green's 3.851 motion nor addressed by the trial court.") Moreover, Hitchcock essentially concedes that the evidence does not qualify as newly discovered evidence because he argued in a separate claim, discussed above, that his trial counsel was ineffective for not presenting evidence that Richard sexually and physical abused family members, which was either known by counsel or could have been discovered by the use of diligence at the time of trial.
Hitchcock did assert in his postconviction motion and argue to the circuit court that newly discovered evidence that Richard "confessed" to the murder of Cynthia Driggers demonstrates his innocence and merits a new trial. At the postconviction evidentiary hearing, Wanda Hitchcock Green testified that sometime in 1994, she commented to Richard about how sad their mother will be when Hitchcock is executed. Richard responded that Hitchcock will not be executed because he did not commit the murder; he only committed the rape.[9] Rossi Meacham,[10] an acquaintance of some *350 members of Hitchcock's family, testified that sometime in 1993 or 1994, when she and Richard were sitting around his mother's kitchen table chatting, Richard confessed to killing "that girl in Florida" and blaming his brother for the crime. Meacham testified that on another occasion, Richard threatened her, stating that he had killed before and was "not ashamed to do it again." Judy Hitchcock Gamble,[11] a niece of James and Richard Hitchcock, testified that in 1982 or 1983, Richard tried to sexually assault her. She was twelve or thirteen years old at the time. Gamble testified that when she resisted, Richard told her that if "I didn't shut up [the] same thing would happen to me that happened to Cindy."
The circuit court denied relief because the evidence of Richard's alleged confessions suffered "from an inherent lack of credibility." The circuit court found that due to this lack of credibility, the evidence did not demonstrate the presence of corroborating circumstances showing the trustworthiness of the statements as required by section 90.804(2)(c), Florida Statutes, and did not satisfy the second prong of Jones II.
We do not reach the issue of whether the trial judge erred in his consideration of the admissibility of the evidence under section 90.804(2)(c) because we conclude that the evidence did not satisfy the second prong of Jones II. Assuming without deciding that the newly discovered evidence would be admissible pursuant to section 90.804(2)(c), Hitchcock has not demonstrated that the newly discovered evidence would probably produce an acquittal or life sentence on retrial because the witnesses were not convincing. The credibility of Green, Meacham, and Gamble is critical to the newly discovered evidence analysis as set forth in Jones II, and the circuit court's finding that these witnesses were not credible is supported by competent, substantial evidence.
Meacham claimed that she did not come forward sooner because she was afraid of Richard. She admitted that she read about Richard's death in the newspaper around the time of his accident in 1994 and called Richard's mother, who confirmed that Richard was deceased. Meacham did not offer a plausible explanation for why she waited nearly a decade after Richard's death to come forward with this evidence. Gamble, likewise, did not offer any reason for her delay in coming forward on her uncle's behalf. Green went public more promptly with her allegations that Richard confessed. She spoke to a reporter in 1996 and testified in an evidentiary hearing on the matter that same year. However, Green did not reveal Richard's alleged confession immediately after the statement was made or even immediately after his death in 1994. Instead, Green waited to reveal one brother's alleged confession until after her other brother was once again sentenced to death in his third resentencing. See Kormondy v. State, 983 So.2d 418 (Fla. 2007) (finding fact that Hazen and Kormondy were "reared as cousins" to be one of many factors detracting from Hazen's credibility). Green's credibility is also questionable because her testimony during the instant postconviction hearing was not identical to her original testimony regarding Richard's alleged confession. In the postconviction hearing, Green did not testify that Richard specifically confirmed that he was responsible for the murder.
Moreover, Jones I directs courts to "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial" when *351 evaluating newly discovered evidence claims. 591 So.2d at 916. The heart of the State's case against Hitchcock was his confession and the testimony regarding the discovery and condition of the victim's body. The evidence connecting Hitchcock to the murder was his confession, hair analysis evidence, and testimony regarding a blood stain on Hitchcock's jeans that matched the victim's blood type. Hitchcock's defense was that he did not kill Cynthia Driggers but helped hide her body and confessed to the murder to protect his brother, who was a father figure to him. Hitchcock was the only witness to testify to this theory. The jury obviously gave great weight to Hitchcock's initial confession and rejected his explanation of that confession. See Melendez, 718 So.2d at 748 (denying newly discovered evidence claim because evidence presented was unlikely to change the verdict where the jury had already rejected the same defense theory). We agree with the circuit court that given the totality of the evidence, the testimony of these three witnesses, which lacked credibility and merely partially inculpated Richard because he expressed personal responsibility for the murder in only one of the comments, is not evidence that so "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Jones II, 709 So.2d at 526. We hold that Hitchcock is not entitled to a new trial.

4. Expert Hair Analysis Testimony
Hitchcock argues that his constitutional rights were violated when the State failed to disclose the deficiencies of hair analyst Diana Bass and then knowingly presented her incompetent and false testimony in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); that guilt-phase counsel was ineffective for failing to challenge the admissibility of Bass's testimony; and that this newly discovered evidence of Bass's incompetence undermined confidence in his conviction.
At trial, Diana Bass testified as an expert hair analyst. She compared thirty hair samples taken from the victim's body against various standards consisting of hairs taken from the victim, Hitchcock, and Richard, and testified that three of the samples were "consistent in microscopic appearance" with Hitchcock's pubic hair. At the postconviction hearing, Hitchcock called as witnesses Bass and two of her former supervisors, Robert Kopec and Steven Platt. Robert Kopec testified that he evaluated Bass's performance in 1978 and concluded that she was not following the basic procedures to secure the integrity of the evidence that she was handling. Steven Platt confirmed that Bass was the expert referred to in Peek v. State, 488 So.2d 52 (Fla.1986), whose testimony was discredited. Bass admitted that she was inadequately trained and that she had left hair samples out overnight against procedure on at least one occasion.
Turning to Hitchcock's newly discovered evidence claim, to obtain a new trial based on newly discovered evidence, a defendant must demonstrate that (1) the evidence was not known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence; and (2) the newly discovered evidence is of such a nature that it would probably produce an acquittal on retrial. See Jones II, 709 So.2d at 521. Hitchcock argues that Bass may have erroneously matched the recovered hairs to Hitchcock and failed to find a match with Richard. First, Hitchcock offers no evidence that Bass actually mishandled the hairs in his case. Second, the hairs have been destroyed and cannot be retested. *352 As a result, Hitchcock's hope of finding a match with Richard is merely speculative. Third, excluding Bass's testimony regarding the match with Hitchcock and non-match with Richard would not likely produce an acquittal. Hitchcock, Richard, and the victim all lived in the same household, and Hitchcock admitted to having sex with the victim. As a result, Bass's testimony that Hitchcock's hairs were found on the victim's body was just as consistent with Hitchcock's defense as it was with the State's case. The hair analysis evidence was of little probative value and cannot reasonably be seen as a definitive feature of the State's case.
We also agree with the circuit court's denial of Hitchcock's Brady claim. In order to establish a Brady violation, Hitchcock must show the following: (1) the evidence at issue was exculpatory or impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the suppression caused prejudice that undermined confidence in the verdict. Wright v. State, 857 So.2d 861, 869-70 (Fla.2003). The circuit court found that the State did not suppress evidence of Bass's poor work habits with respect to the 1977 guilt-phase trial because the negative review did not occur until 1978. We agree that the State could not suppress a personnel evaluation that did not yet exist at the time of trial. Also, quoting Preston v. State, 528 So.2d 896 (Fla.1988), the circuit court explained that the State's responsibility under Brady does not extend "to examining in depth the personnel files of proposed expert witnesses and divulging possible adverse comments to the defense." In respect to the prejudice prong of this Brady claim, evidence of Bass's poor job performance would not be exculpatory because Hitchcock admitted to having sex with the victim, which explains the hair matches much more effectively than would evidence regarding the hair analyst's habits. Additionally, we agree that Hitchcock has failed to demonstrate prejudice because he did not present any evidence indicating that Bass mishandled the evidence in his case. See Grim v. State, 971 So.2d 85, 93 (Fla. 2007) (finding no prejudice from State's failure to disclose documents questioning medical examiner's qualifications where defense failed to present any evidence challenging validity of examiner's autopsy in that case).
Hitchcock's Giglio claim is similarly without merit. In order to establish a Giglio violation, Hitchcock must show the following: (1) the testimony was false; (2) the prosecutor knew that the testimony was false; and (3) the testimony was material. Craig v. State, 685 So.2d 1224, 1226 (Fla.1996). Hitchcock presented no evidence that Bass's testimony in his case was actually false. Hitchcock merely speculates that her analysis came to the incorrect conclusions due to her subsequent poor performance evaluation. Hitchcock also did not offer any evidence indicating that the State knew about Bass's poor work techniques at the time of Hitchcock's trial, much less that the State knew her testimony to be false.
Finally, we also agree with the circuit court's conclusion that Hitchcock's counsel was not ineffective for failing to object to Bass's testimony during the 1977 guilt phase. There is no basis for finding counsel ineffective in the instant case, where the unfavorable report was not written until the year after the trial.

5. Presence During Peremptory Challenges
Hitchcock next argues that the circuit court erred in denying his claim that his constitutional rights were violated when he was not present at the bench conference where peremptory challenges *353 were exercised, that trial counsel was ineffective for failing to ensure that Hitchcock was present during all critical stages of the proceedings, and that the circuit court erred by not ensuring that the transcript was complete.[12] Hitchcock argues that his trial counsel was ineffective because counsel waived Hitchcock's right to be present at bench conferences where certain peremptory strikes were exercised and because counsel failed to request that the discussion at the bench regarding peremptory challenges be transcribed.
The circuit court found that even if some of the peremptory challenges were made at the bench and outside of Hitchcock's presence, his ineffective assistance of counsel claim is without merit because he failed to satisfy the prejudice prong of Strickland. The circuit court found that Hitchcock failed to "establish a reasonable probability that the outcome of the proceedings would have been different if jury selection had been carried out in any other manner." We agree. Hitchcock has failed to point to any challenges that were or were not made during the bench conferences that would have been handled differently if he had been present, and he did not allege that he was actually prejudiced by his counsel's actions during jury selection.[13] The trial court did not err in denying relief on this claim.
We also agree that Hitchcock has not demonstrated his counsel to be ineffective for failing to request that the challenges be transcribed. Hitchcock only speculates about the prejudice caused by not having access to the transcripts. Such speculation is insufficient to meet the second prong of Strickland. Thompson v. State, 759 So.2d 650, 660 (Fla.2000) (rejecting claim of ineffective assistance of appellate counsel for failure to have proceedings transcribed because petitioner did not point to specific errors that occurred in omitted portions of record).

B. Penalty-Phase Claims

1. Testimony of Debra Lynn Driggers
Hitchcock argues that his resentencing counsel was ineffective for failing to object to testimony by the victim's sister, Debra Driggers. The State called Debra Driggers as a penalty-phase witness. She testified that the victim had told her about "inappropriate things that Ernie [James *354 Hitchcock] was doing to her" and that when Driggers was twelve years old, she and the victim confronted Hitchcock, who told the girls that he would "rape and kill" them if they told their mother about the inappropriate things that were going on. Driggers testified that as a result of this threat, she and the victim were scared. She stated that on the night prior to the murder, she told the victim that they must tell their mother about Hitchcock, but the victim said "we can't" and begged Driggers not to tell. Driggers testified that she did not tell authorities about these conversations in 1976 because she was scared that Hitchcock would kill her too. Resentencing counsel did not object to any portion of this testimony on any basis.
In his postconviction motion, Hitchcock alleged that his resentencing counsel "was ineffective for failing to object to this damaging and inadmissible testimony and for failing to move for a mistrial" because the "admission of the threats that James Hitchcock allegedly made to Debra Lynn Driggers and Cynthia Driggers and prior inappropriate sexual contact between James Hitchcock and Cynthia [Driggers] was unfairly prejudicial, improper character evidence, immaterial and irrelevant, and a non-statutory aggravator." Hitchcock asserted that the testimony invited the jury to consider uncharged crimes and acts as nonstatutory aggravation, instead of deciding whether the State had met its burden of proof of the statutory aggravators. Hitchcock did not allege that his counsel was ineffective for not objecting to Driggers' testimony, which included several statements made by the victim, on hearsay grounds.[14]
The circuit court denied the claim, holding that counsel's failure to object to the testimony was neither deficient nor prejudicial. The circuit court found that resentencing counsel's performance was not deficient because the testimony was admissible to establish the existence of two aggravating factors: commission in the course of the enumerated felony of sexual battery and HAC. See § 921.141(5)(d), (h) (1977), Fla. Stat.[15] The circuit court, citing to section 794.011(4)(c), Florida Statutes, found the testimony relevant to whether the murder was committed during the course of a sexual battery because sexual battery "may occur when the offender coerces the victim to submit by threatening to retaliate against the victim or any other person."[16] *355 The circuit court found the testimony relevant to the HAC aggravating factor because HAC can be proven by threats that cause the victim to experience fear leading up to the murder.
We agree that resentencing counsel was not ineffective for failing to object to Driggers' testimony on the grounds that it was irrelevant and unfairly prejudicial. The sexual battery statute states that "consent" means "intelligent, knowing, and voluntary consent and shall not be construed to include coerced submission." § 794.011(1)(h), Fla. Stat. (1977) (emphasis added). The evidence of Hitchcock's threats and the ensuing fear experienced by the victim is directly relevant to the issue of consent. With respect to HAC, the circuit court correctly found that a threat on the victim's life contributes to the victim's apprehension prior to death and is thus relevant to the HAC aggravating factor. A threat need not be made contemporaneously with the murder in order to be relevant to the HAC aggravator if it causes the victim to experience fear, emotional strain, and terror in the moments leading up to her murder. See Pooler v. State, 704 So.2d 1375, 1378 (Fla. 1997) (finding evidence that victim was threatened by defendant two days before she was killed to be relevant to HAC aggravating factor even though threat was not delivered on day of murder).
Moreover, the State's questioning of Driggers did not violate this Court's decision in Hitchcock V or the trial court's ruling on defense counsel's objection to the State's comment during opening statements that Hitchcock engaged in "inappropriate conduct" after moving in with his brother's family. The trial court overruled the defense's objection and decided that the State could present evidence of inappropriate conduct between Hitchcock and the victim so long as it was tailored to the aggravating factors but could not present evidence of inappropriate conduct between Hitchcock and Debra Driggers. This ruling was consistent with our direction in Hitchcock V, 673 So.2d at 863, that "sexual attacks upon persons other than the victim" not be the subject of the State's questions or evidence. At no time did Driggers testify that she was physically attacked by Hitchcock. Counsel was not deficient for failing to request that the court further limit the State by requiring it to parse out threats made against the witness from highly probative threats made against the victim. As the circuit court noted, "the threats were made to both girls, and Ms. Driggers could hardly testify about her sister's fear without acknowledging her own." The threat to "rape and kill" the sisters was made simultaneously. Driggers necessarily had to convey that she too was threatened if she was to testify about the probative threats made to the victim.
We also agree with the circuit court's conclusion that Hitchcock failed to demonstrate prejudice. Had counsel objected to Driggers' testimony and succeeded in having her testimony limited to threats made only to the victim, there is no reasonable probability that the outcome of the proceedings would have been different. The Sentencing Order explained that Hitchcock's claim that the victim consented to intercourse was unsupported. An expert *356 testified at the 1996 resentencing that the victim was a virgin when she was sexually assaulted by Hitchcock, and Hitchcock's initial statement following his arrest was inconsistent with his claim that the victim consented to sexual intercourse. As for HAC, the Sentencing Order explained that the victim endured a "painful sexual assault, removal from her home, [and] beatings and chokings in order to secure her eventual silence." Hitchcock's initial statement supports this finding as well. He told police that he "got up and grabbed her by the neck and made her quit hollerin'," and that he "just kept chokin' and chokin'." Sentencing Order at 4. Likewise, even if Hitchcock had asserted that his counsel was ineffective for not objecting to portions of Driggers' testimony as hearsay, Hitchcock was not prejudiced by any of the statements which may have been inadmissible. The aggravating factors are supported without reference to Driggers' testimony that the victim was scared of Hitchcock before her murder and that the victim begged Driggers not to tell their mother about Hitchcock's behavior and threats. Given the totality of the evidence, our confidence in the sentence is not undermined by the scope of Driggers' testimony.

2. Mitigation Evidence
Hitchcock argues that resentencing counsel failed to properly investigate and present the following statutory mitigating circumstances: (1) the crime was committed while Hitchcock was under the influence of an extreme mental or emotional disturbance; and (2) he had a substantial impairment of his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Hitchcock asserts that counsel was ineffective for not asking the defense's mental health expert to testify to whether these statutory mitigating circumstances applied at the time of the murder. Hitchcock also asserts that counsel was ineffective for retaining a mental health expert too late in the proceedings and for failing to refer Hitchcock to a neuropsychologist for examination after learning from the late-retained mental health expert that there were indications of possible brain damage.

a. Statutory Mitigation
With regard to Hitchcock's allegation that counsel was deficient for failing to question the expert about whether Hitchcock was under the influence of extreme mental or emotional disturbance at the time of the murder or whether his capacity to appreciate the criminality of his conduct was substantially impaired, the circuit court "disagree[d] that Dr. Toomer's presentation was inadequate, or that evidence presented at the evidentiary hearing establishes that counsel's performance was deficient or prejudicial in this regard." We agree with the circuit court's conclusion that Hitchcock has not demonstrated that he was prejudiced by his counsel's failure to ask Dr. Toomer if either of the statutory mental health mitigating factors was applicable. Our confidence in Hitchcock's sentence is not undermined by Dr. Toomer's not testifying to his ultimate conclusion on the applicability of the statutory mitigating factors in light of the extensive mitigation that was presented and the extremely weighty aggravators proven in this case.
During resentencing, Dr. Jethro W. Toomer testified as an expert in forensic psychology on Hitchcock's behalf. He opined that Hitchcock suffers from lifelong personality difficulties, including problems with self-concept and self-identification, lacks sufficient skills to make appropriate judgments, and is "characterized by poor interpersonal relationships and overall instability." Dr. Toomer diagnosed Hitchcock *357 as having borderline personality disorder. He did not diagnose Hitchcock as suffering from any major mental illness. When asked if Hitchcock's personality difficulties would have had an effect on him at the time of the crime, Dr. Toomer answered "[n]ot only at the time of the crime but his entire life." When asked more generally what Hitchcock's mental status would have been at the time of the crime, Dr. Toomer answered:
At the time of the incident Mr. Hitchcock was experiencing the effects of the forementioned borderline personality difficulties. That was characterized by his impulsivity that was a function of his inability to cope with an emotionally charged situation, his inability to deal with issues relating to abandonment and rejection and his inability to cope with inevitable stressors that individuals encounter. Mr. Hitchcock's behavior was characteristic of individuals who suffer from the personality deficits and dysfunction that we have described.
Dr. Toomer was not asked specifically if he believed that either of the statutory mental health mitigating factors was present. Hitchcock points out that the prosecuting attorney stated during closing argument that "Doctor Toomer did not render the opinion at any time during his testimony that the defendant was under the influence of extreme mental or emotional disturbance at the time of the crime."
Dr. Toomer testified during the postconviction hearing. He explained that when his deposition was taken in August of 1996 and at the time of his testimony during the resentencing, he was of the opinion that both statutory mitigating factors, influence of extreme mental or emotional distress and impaired capacity to appreciate criminality or conform one's conduct, were applicable to Hitchcock at the time of the murder. Dr. Toomer added that extreme mental or emotional disturbance "has existed for [Hitchcock] for most of his life." Dr. Toomer testified that he had anticipated being asked to opine as to the presence of those two statutory mitigating factors during resentencing.
Hitchcock's resentencing counsel testified during the postconviction hearing. Attorney Kelly Sims testified that he and co-counsel Patricia Cashman were concerned that the prosecutor would present damaging evidence "under the guise of rebuttal to mitigation." As a result, they were cautious about presenting mental health mitigation. Sims did not recall any strategic decision not to present evidence relevant to the statutory mental mitigating factors and could not remember "any specifics about Doctor Toomer and what he was going to testify to." Sims was asked about a notice filed by Cashman on August 13, 1996, which stated that the defense expert would be presenting evidence that the defendant was under the influence of extreme mental or emotion disturbance at the time of the murder, and he still could not recall discussing that statutory mitigating factor with Cashman or Dr. Toomer. Neither the State nor Hitchcock asked Cashman why she did not ask Dr. Toomer about the presence of statutory mitigation at the 1996 resentencing. In fact, Hitchcock did not cross-examine Cashman at the postconviction hearing.
Having reviewed both Hitchcock's resentencing and the postconviction record, even if we assume that Hitchcock's counsel was deficient, we agree with the circuit court that Hitchcock was not prejudiced. First, substantial mitigating evidence was presented during Hitchcock's resentencing. While counsel did not ask Dr. Toomer for his ultimate opinion regarding statutory mitigation, counsel did present evidence through Dr. Toomer that at time of the offense, Hitchcock was experiencing *358 the effects of borderline personality disorder, which is characterized by impulsivity and an inability to cope with an emotionally charged situation. Based on Dr. Toomer's testimony and other evidence, including the testimony of family members, fellow death row inmates, and an attorney who represented Hitchcock in a prior appeal, the trial court found one statutory mitigating factor, Hitchcock's young age at the time of the crime, and twenty-three nonstatutory mitigating factors, including that Hitchcock was under influence of lifelong personality difficulties and that his crime resulted from an unplanned impulsive act. During the postconviction hearing, Dr. Toomer did testify that he considered Hitchcock to be under the influence of extreme mental or emotional disturbance for "most of his life" and that this disturbance impaired Hitchcock's ability to appreciate the criminality of his conduct or conform his conduct to the requirements of law. However, Dr. Toomer did not add any explanation as to whether Hitchcock's impulsivity was particularly acute at the time of the crime or how Hitchcock's borderline personality disorder and personality difficulties caused the sexual assault and murder. As a result, Dr. Toomer's postconviction testimony did not substantially augment the mental health mitigation that was presented at resentencing but, instead, merely offered a bare, unelaborated opinion that two statutory mitigating factors were applicable. This Court has held that counsel is not ineffective for failing to present additional evidence that would be cumulative to that already presented. See, e.g., Downs v. State, 740 So.2d 506, 516 (Fla. 1999) ("[T]o the extent Downs offers additional facts not previously presented at the resentencing hearing, such facts are cumulative to the evidence presented by Downs during the resentencing and, therefore, are insufficient to warrant relief under Strickland.").
Second, the extremely weighty aggravation in this case would outweigh the mitigation, even if Dr. Toomer had specifically opined that the statutory mental health mitigating factors were applicable. The trial court found four aggravating circumstances in this case: (1) Hitchcock committed the crime while he was under a sentence of imprisonment; (2) the crime was committed while Hitchcock was engaged in the enumerated felony of sexual battery; (3) the crime was committed for the purpose of avoiding or preventing a lawful arrest; and (4) the crime was HAC. Given this substantial aggravation, our confidence in his death sentence is not undermined by counsel's failure to solicit Dr. Toomer's opinion regarding the statutory mitigating factors.

b. Brain Damage
The circuit court found no merit to Hitchcock's claim that his resentencing counsel was ineffective for retaining a mental health expert too late in the proceedings and for failing to refer Hitchcock to a neuropsychologist for examination after learning that there were indications of possible brain damage. The circuit court held that a "claim that there is a `possibility' of impairment constitutes mere speculation which is insufficient to state a valid basis for relief" and that Hitchcock was not prejudiced by his counsel's failure to arrange for additional testing for neuropsychological testing. The circuit court reasoned that
the evidence and testimony presented at the evidentiary hearing are sufficient to support the conclusion that while Defendant may have suffered (and may continue to suffer) from a borderline personality disorder, he had the ability to appreciate the criminality of his conduct. He did not wish to be accused of sexual *359 battery by the victim, because that could result in returning to prison, where he had already served time. This Court further finds that there is no reasonable probability that the outcome of the proceedings would have been different if counsel had arranged for additional testing for neuropsychological impairment.
Postconviction Order I at 9. We do not find reversible error in the trial court's decision.
During his evaluation of Hitchcock in preparation for the resentencing, Dr. Toomer administered the Bender Gestalt test that screens for evidence of organicity or brain damage. At the postconviction hearing, Dr. Toomer explained that an individual's performance on that test can suggest a possibility of organicity, underlying personality disturbance, or thought process disturbances, and that if an individual's performance raises concern, the "next step would be to conduct a neuropsychological evaluation or some neurologically based assessment in order to pinpoint the extent and the nature of any underlying neurologically based impairment." Dr. Toomer explained that he "could not render an opinion, definitive opinion with regard to whether there was any organic deficit or brain damage" from Hitchcock's performance but that there were "soft signs which means there was some indication that suggested there might be some underlying organically based deficit." He opined that the results were significant enough to make follow-up neuropsychological testing appropriate. Dr. Toomer could not remember if he discussed further testing with defense counsel, but he stated that it was his standard procedure to go over all the results of his evaluation with counsel and to indicate whether further testing is necessary.
Dr. Bill E. Mosman, who was tendered and accepted as an expert in forensic psychology during the postconviction hearing, also evaluated Hitchcock and testified on his behalf. Dr. Mosman reviewed Dr. Toomer's data and testing, and testified that while Dr. Toomer's testing was appropriate for a psychological evaluation, it was his opinion that Hitchcock should have been referred to a neuropsychologist based on Dr. Toomer's evaluation. Dr. Mosman testified that while there are "several explanations" for the test results that Dr. Toomer recorded, such results are "frequently seen in the right hemisphere deficits and brain damage population." On cross-examination, Dr. Mosman admitted that Hitchcock has not manifested behavior indicating brain damage during the decades that he has been in prison. However, Dr. Mosman was of the view that "the controlled, regimented, highly predictable, non-access to drug, alcohol environment" of prison is essentially "treatment" that increases the "probability of good functioning" in brain-damaged individuals. He concluded that "the jury is still out, clinical jury, if you will, on the one piece on exactly the contours of that organic deficit." Yet, Dr. Mosman, who is a neuropsychologist, did not perform a neuropsychological examination of Hitchcock.
Hitchcock next called Dr. Henry Dee, another clinical neuropsychologist who was tendered and accepted as an expert in neuropsychology, during the postconviction hearing. Dr. Dee had performed a neuropsychological evaluation of Hitchcock to determine the presence of any "cerebral damage, insult, disease or affect." Hitchcock performed normally on all of the tests except the Wisconsin Card Sorting Test and the Categories Test. Dr. Dee explained that Hitchcock's failure on these tests indicated the presence of frontal lobe brain damage, which is associated with "deficiency of behavior control" and a "lack of adequate ability to inhibit responding." *360 Dr. Dee answered in the affirmative when asked if "there was any reasonable degree of neuropsychiatric probability that [Hitchcock] has frontal lobe damage." However, Dr. Dee further explained that a failing score on the tests can only indicate the presence of frontal brain damage, not the extent of the damage. Dr. Dee did not present the results of any brain imaging or opine as to the extent of any impairment at the time Hitchcock murdered the victim.
In rebuttal, the State called Dr. Harry Albert McClaren as its expert in forensic psychology at the postconviction hearing. He testified that the Bender Gestalt test conducted by Dr. Toomer is a "rough screening tool" and that Hitchcock's results showed "very minor distortions" that could be a reason to recommend a follow-up neuropsychological evaluation. Dr. McClaren administered the WAIS-III intelligence test, which resulted in a thirteen-point spread between verbal and performance scores. Dr. McClaren explained that one explanation for the spread is brain dysfunction, but there are other explanations, and that if he had been hired by defense counsel to evaluate Hitchcock for a capital case, he would have informed counsel of the spread and explained that the spread is statistically significant and that brain dysfunction could be the cause. He would have advised counsel that "one of the things they should consider is consulting with a neuropsychologist." Dr. McClaren cautioned that identifying a test result as statistically significant is one thing but that finding the result to be indicative of brain damage "is another leap." Dr. McClaren pointed out that Hitchcock underwent neuropsychological testing in 1984 and 1988, and the results at that time were normal. Overall, Dr. McClaren opined, "while there is some possibility of a degree of organicity" and "while there's some possibility that this [organicity] may have had some contribution to an act of impulsive violence," other explanations such as not wanting to be sent back to prison, not wanting to be caught, alcohol use, and a personality disorder that makes Hitchcock less concerned about the rights of other people probably contributed more to the commission of the murder than Hitchcock's possible brain damage.
Attorney Sims testified that he did not remember any conversations with Dr. Toomer on the subject of brain damage. Attorney Cashman was not questioned about her decision to not pursue further neuropsychological testing.
The circuit court found that Dr. Toomer's psychological evaluation was adequate and that counsel was not deficient for failing to have Hitchcock examined by a neuropsychologist. Competent, substantial evidence supports this finding that counsel was not deficient. As set forth above, during the postconviction hearing, there was conflicting expert testimony presented, which was for the trial judge to resolve.
We also agree that Hitchcock has not demonstrated that he suffered any prejudice as a result of defense counsel's failure to seek neuropsychological testing. The circuit court's finding that Hitchcock offered only speculation that he suffered from brain damage at the time of the murder is supported by competent, substantial evidence. Furthermore, even if Hitchcock's counsel had obtained and presented evidence of brain damage during Hitchcock's resentencing, we find that the circuit court did not err in determining that there is no reasonable probability that the outcome would have been different. First, as discussed above, the aggravating factors in this case are extremely weighty. Second, the mental health experts testified to Hitchcock's normal intelligence, lack of *361 mental illness, and positive adaptation to prison life.

3. Caldwell Claim
The United States Supreme Court held in Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Hitchcock argues that the trial court's instruction in his resentencing improperly conveyed to the jury that it had no responsibility for the sentence that would be imposed on Hitchcock and that his resentencing counsel was ineffective for not objecting to the instruction.
We agree with the circuit court that Hitchcock's claim that the trial court improperly instructed the jury is procedurally barred because the claim could have been raised on direct appeal but was not. See Jones v. State, 928 So.2d 1178, 1183 n. 5 (Fla.2006) (holding Caldwell claim procedurally barred because not raised on direct appeal).
We further hold that resentencing counsel was not ineffective for not objecting to the trial court's jury instruction regarding the jury's recommendation. Upon reviewing the instruction given, we find that it does not materially differ from Florida's standard jury instruction, which "fully advises the jury of the importance of its role, correctly states the law, and does not denigrate the role of the jury." Brown v. State, 721 So.2d 274, 283 (Fla.1998) (citations omitted); see also Card v. State, 803 So.2d 613, 628 & n. 14 (Fla.2001); Combs v. State, 525 So.2d 853, 855-58 (Fla.1988) (holding that the characterization of jury's role as advisory in the standard jury instructions does not violate Caldwell). The instruction given in this case sufficiently instructed the jury of its responsibility and important role in the sentencing process and therefore did not violate Caldwell. Counsel cannot be deemed ineffective for failing to make a meritless objection. See Melendez v. State, 612 So.2d 1366, 1369 (Fla.1992).

4. Sexual Battery Claim
Hitchcock argues that his resentencing counsel was ineffective for not arguing that the State failed to prove beyond a reasonable doubt the aggravating factor that the murder was committed during the commission of a sexual battery because any sexual battery that may have occurred was completed prior to the murder. Hitchcock also argues that his resentencing counsel was ineffective for not requesting a jury instruction explaining the elements of sexual battery.
The circuit court correctly noted that "[t]here is no requirement that the murder must occur at the exact same time as the underlying felony" for the murder in the course of a felony aggravating factor to be applicable. See Bogle v. State, 655 So.2d 1103, 1108 (Fla.1995) (affirming finding of sexual battery aggravating factor, despite the lack of conviction for sexual battery, on basis of medical examiner testimony that sexual activity occurred within three hours of victim's death). In this case, the medical examiner who testified at Hitchcock's resentencing estimated that the victim's hymen tear occurred "a few hours before the death of the victim." At one point, he testified that the tear could have occurred as recently as a half hour before the murder. Hitchcock is wrong to suggest that the time of the hymen tear can identify the time the sexual battery ended. The hymen tear could have occurred at the beginning of the sexual assault, and there was no testimony indicating *362 how long the sexual assault lasted. Thus, Hitchcock's claim that his resentencing counsel was ineffective for not arguing that the aggravating factor was inapplicable because any sexual battery was completed prior to the murder is without merit.[17]
The circuit court also found that resentencing counsel was not deficient for failing to object to the trial court's instructions regarding this aggravating factor or for failing to request a special instruction that would have required the jury to determine whether a sexual battery actually occurred. We agree that counsel was not deficient for failing to object to the aggravating factor instruction. This Court held in Hitchcock I that there was sufficient evidence of a sexual battery to warrant an instruction on murder in the course of a felony. 413 So.2d at 745. The record likewise contains sufficient evidence that the murder was committed during the commission of a sexual battery to warrant giving an instruction on that aggravating factor.
We do agree with Hitchcock's argument that our case law supports that the jury be instructed regarding the elements of sexual battery. This Court explained in Occhicone v. State, 570 So.2d 902, 906 (Fla.1990), that the elements of the underlying felony should be explained to the jury where the State argues that the aggravating factor of the murder being committed during the course of an enumerated felony applies. However, the Court also held in Occhicone that failing to instruct the jury on the elements of the underlying felony was not fundamental error where there were other valid aggravating circumstances. Id. The Court further explained that the lack of instruction is harmless error where the State proves the underlying felony beyond a reasonable doubt:
Speculating that Occhicone's jury may have relied on one word without knowing its specific legal definition is of no moment here because the judge as the sentencer must make written findings supporting the sentence. We must assume that the instant judge knew the technical definition of burglary, and the facts support his finding the mother's murder to have been committed during a burglary.
Id. (footnote omitted). Here, Hitchcock was not prejudiced by his counsel's failure to request an instruction on sexual battery because the record supports the trial judge's finding that the aggravating factor that the murder was committed during the commission of a sexual battery was proven beyond a reasonable doubt. Thus, our confidence in the jury's recommendation and the trial court's Sentencing Order is not diminished by counsel's failure to request an instruction detailing the elements of sexual battery.

5. Ring Claim
On appeal, Hitchcock acknowledges that this Court has denied relief on similar claims and states that he raises the claim only to preserve the issue for federal review. We write only to clarify that Hitchcock is not entitled to relief on this claim because this Court has held that Ring does *363 not apply retroactively. Johnson v. State, 904 So.2d 400, 409 (Fla.2005). To the extent that Hitchcock relies on Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), his argument is also without merit. This Court has consistently held that Apprendi does not require that aggravating circumstances be charged in the indictment, submitted to the jury, and individually found by a unanimous jury verdict. Porter v. Crosby, 840 So.2d 981, 986 (Fla.2003); Brown v. Moore, 800 So.2d 223, 224-25 (Fla.2001).

III. PETITION FOR WRIT OF HABEAS CORPUS
In his petition for a writ of habeas corpus, Hitchcock raises numerous claims. He primarily argues that his appellate counsel was ineffective for failing to raise certain issues on direct appeal. Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for a writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the Strickland standard, to grant habeas relief based on ineffectiveness of counsel, this Court must determine whether the alleged omissions "constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance" and whether the deficiency "compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at 1069. Claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000). "If a legal issue `would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." Id. (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla. 1994)).
Hitchcock argues, based on Ring and Apprendi, that he was unconstitutionally deprived of notice that he could be convicted under a theory of felony murder and that he was unconstitutionally deprived of a unanimous verdict identifying whether the jury found him guilty of felony murder or premeditated murder. He also argues that his appellate counsel was ineffective for not raising this issue on direct appeal. This Court rejected virtually identical arguments in Mansfield v. State, 911 So.2d 1160, 1178-79 (Fla.2005). Accordingly, Hitchcock's claim is likewise without merit.
Next, we address Hitchcock's habeas claim that Florida's death penalty scheme is unconstitutional as applied to him under Ring and Apprendi and that his appellate counsel was ineffective for not raising on direct appeal the issue of Apprendi's impact on Florida's capital sentencing scheme. As discussed above, this Court has held that Florida's capital sentencing scheme is not unconstitutional. As for Hitchcock's corresponding ineffective assistance of counsel claim, neither Ring nor Apprendi had been decided when the appeal of Hitchcock's latest resentencing was pending before this Court. Hitchcock VI, 755 So.2d at 640, reh'g denied, No. SC92717 (Fla. May 3, 2000) (unpublished order). Counsel cannot be expected to anticipate changes in the law. Walton v. State, 847 So.2d 438, 445 (Fla.2003). Hitchcock's argument is without merit.
Hitchcock's remaining claims of ineffective assistance of appellate counsel would, as discussed in the related postconviction claims above, "in all probability" have been found without merit if raised on direct *364 appeal. Thus, Hitchcock's appellate counsel was not ineffective for failing to raise those issues on appeal.
In his final habeas claim, Hitchcock asserts that his rights will be violated because he may be incompetent at the time of execution. This claim is not ripe for review until a death warrant has been issued, which has not occurred in this case. Rogers v. State, 957 So.2d 538, 556 (Fla. 2007) (citing Griffin v. State, 866 So.2d 1, 21-22 (Fla.2003)). Therefore, Hitchcock is not entitled to relief at this time.

IV. CONCLUSION
For the reasons stated above, we affirm the circuit court's denial of Hitchcock's motion for postconviction relief and deny Hitchcock's petition for a writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The mitigating circumstances concerning the crime included: (1) Hitchcock was under the influence of alcohol and marijuana at the time he committed the crime; (2) he was under influence of life-long personality difficulties; (3) the crime resulted from an unplanned, impulsive act; (4) he was unarmed when he committed the crime; (5) he surrendered and cooperated with authorities; and (6) he gave a voluntary statement, freely confessing to the crime.
[2] The mitigating features of Hitchcock's adverse background included: (1) he grew up in extreme rural poverty; (2) he experienced the lingering death of his natural father; (3) he witnessed his mother's epileptic seizures; (4) he dropped out of school at the seventh grade and was unable to pursue a formal education; (5) he witnessed and experienced emotional and physical abuse from his alcoholic stepfather; (6) he developed a borderline personality disorder; (7) he left home at an early age; (8) he worked hard in several demanding jobs; and (9) he risked his life to save his uncle's life.
[3] The mitigating positive character traits included: (1) Hitchcock learned to read and write, attained a GED, and assisted others in doing the same; (2) he acted as mediator in prison; (3) he remediated childhood character "deficits"; (4) he was thoughtful of family members; (5) he exhibited artistic talent; (6) he undertook steps toward self-improvement, such as quitting smoking; (7) he exhibited good conduct during court proceedings; and (8) he retained love and support of family members.
[4] On December 19, 2001, Hitchcock filed a Florida Rule of Criminal Procedure 3.853 motion for postconviction DNA testing, asserting that DNA testing of evidence taken from the scene could prove that Richard Hitchcock was guilty of the murder or that Hitchcock was otherwise innocent. The trial court denied the motion, and this Court affirmed. Hitchcock v. State, 866 So.2d 23 (Fla.2004) (Hitchcock VII).
[5] Hitchcock's postconviction claims were as follows: (1) resentencing counsel was ineffective for failing to object to the testimony of Debra Lynn Driggers; (2) guilt-phase counsel and resentencing counsel were ineffective for failing to object to testimony and argument that the victim was a virgin at the time of the offense; (3) guilt-phase counsel was ineffective for failing to spend adequate time preparing for trial and thus opened the door to negative character evidence about Hitchcock and for failing to admit evidence implicating Richard Hitchcock in the murder; (4) resentencing counsel was ineffective for failing to recall Dr. Toomer to explain the Minnesota Multiphasic Personality Inventory (MMPI) narrative report introduced by the State; (5) resentencing counsel was ineffective for failing to have Hitchcock evaluated for neuropsychological impairment; (6) resentencing counsel was ineffective for failing to fully develop available statutory and nonstatutory mitigating evidence; (7) the State violated Hitchcock's constitutional rights by destroying exculpatory physical evidence; (8) the trial court's instructions diminished the jury's role in sentencing in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and counsel was ineffective for not objecting to the instructions; (9) newly discovered evidence demonstrated that Richard Hitchcock committed the murder; (10) the State failed to disclose the deficiencies of hair analyst Diana Bass and then knowingly presented the analyst's incompetent and false testimony, guilt-phase counsel was ineffective for failing to challenge the admissibility of Bass's testimony, and this newly discovered evidence of Bass's incompetence undermined Hitchcock's conviction; (11) resentencing counsel was ineffective for failing to object to the court's felony-murder instruction and for failing to request a jury instruction on the elements of sexual battery; (12) Hitchcock's constitutional rights were violated because he was not present at the bench conference when peremptory challenges were exercised, trial counsel was ineffective for failing to ensure that Hitchcock was present during all critical stages of the proceedings, and the trial court erred by not ensuring that the transcript was complete; and (13) Florida's capital sentencing scheme is unconstitutional as applied to Hitchcock.
[6] Hitchcock's claims on appeal are: (1) the circuit court erred in holding that Hitchcock's guilt-phase claims were procedurally barred; (2) the circuit court erred in denying Hitchcock's claim that resentencing counsel was ineffective for failing to object to the testimony of Debra Lynn Driggers; (3) the circuit court erred in denying Hitchcock's claim that guilt-phase counsel was ineffective for failing to spend adequate time preparing for trial and thus opened the door to negative character evidence about Hitchcock and for failing to admit evidence implicating Richard Hitchcock in the murder; (4) the circuit court erred in denying Hitchcock's claim that resentencing counsel was ineffective for failing to present available evidence of statutory mitigating circumstances and organic brain damage; (5) the circuit court erred in denying Hitchcock's claim that the State violated his constitutional rights by destroying exculpatory physical evidence; (6) the circuit court erred in denying Hitchcock's claim that the trial court's instructions diminished the jury's role in sentencing, in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and counsel was ineffective for not objecting to the instructions; (7) the circuit court erred in denying Hitchcock's claim that newly discovered evidence demonstrated that Richard Hitchcock committed the murder; (8) the circuit court erred in denying Hitchcock's claim that his constitutional rights were violated when the State failed to disclose the deficiencies of hair analyst Diana Bass and then knowingly presented the analyst's incompetent and false testimony, guilt-phase counsel was ineffective for failing to challenge the admissibility of Bass's testimony, and this newly discovered evidence of Bass's incompetence undermined his conviction; (9) the circuit court erred in denying Hitchcock's claim that resentencing counsel was ineffective for failing to object to the court's felony-murder instruction and for failing to request a jury instruction on the elements of sexual battery; (10) the circuit court erred in denying Hitchcock's claim that his constitutional rights were violated when he was not present at the bench conference where peremptory challenges were exercised, trial counsel was ineffective for failing to ensure that Hitchcock was present during all critical stages of the proceedings, and the trial court erred by not ensuring that the transcript was complete; and (11) the circuit court erred in denying Hitchcock's claim that he is entitled to relief under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
[7] Hitchcock's habeas claims are: (1) Hitchcock's constitutional rights were violated when he was deprived of notice of felony murder and a unanimous verdict identifying whether the jury found him guilty on the theory of felony murder or premeditated murder, and appellate counsel was ineffective for failing to raise this claim on direct appeal; (2) appellate counsel was ineffective for failing to raise on direct appeal the claim that Hitchcock's absence from crucial portions of his trial was a violation of his constitutional rights; (3) appellate counsel was ineffective for failing to challenge on direct appeal the trial court's finding that the murder was committed during the course of a sexual battery; (4) appellate counsel was ineffective for failing to raise on direct appeal the claim that the resentencing instructions violated Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (5) Florida's death penalty statute is unconstitutional because it violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and (6) Hitchcock is incompetent to be executed.
[8] On a similar note, Hitchcock argues that counsel was ineffective for not reviewing Hitchcock's testimony and not "counsel[ing] him on avoiding unnecessary and prejudicial responses." Hitchcock is not entitled to relief on this basis because he has not explained what unnecessary and prejudicial responses could have been avoided through additional preparation and how those responses prejudiced him. See Monlyn v. State, 894 So.2d 832, 835 (Fla.2004) ("A defendant must point to specific acts or omissions of counsel that are `so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052)).
[9] Green also testified about this incident in a 1996 evidentiary hearing. At that time, she testified that Richard explicitly confirmed that he was the one responsible for the murder. In the current proceedings, Green did not testify that Richard explicitly confessed to his own involvement in the murder.
[10] This witness's name is also sometimes spelled "Rossie Meacham" or "Robbie Meacham" in the record.
[11] This witness's name is also sometimes spelled "Gambale" in the record.
[12] To the extent that Hitchcock makes the substantive claims that he was denied his right to be present during a critical stage of the proceeding and that he was denied a complete record, these claims are procedurally barred because they could have been raised on direct appeal. See, e.g., Spencer v. State, 842 So.2d 52, 68 (Fla.2003) (holding claim of inadequate voir dire procedurally barred because it was not raised on direct appeal). Moreover, Hitchcock's claim that he was denied his constitutional right to be present during a critical stage of the proceeding is without merit. At the time of Hitchcock's trial and this Court's decision to affirm his conviction on direct appeal, the right to be present at jury selection proceedings had not yet been interpreted as a right to be present at the bench during the exercise of peremptory challenges. The right to be present at the actual site where jury challenges are exercised was not established until 1995 in Coney v. State, 653 So.2d 1009 (Fla. 1995), and this Court has specifically rejected attempts to apply Coney retroactively. See, e.g., Boyett v. State, 688 So.2d 308, 309 (Fla. 1996).
[13] Hitchcock argues that the bench conferences being held outside of his presence were such serious errors that prejudice should be presumed. Strickland holds that "[c]onflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." 466 U.S. at 693, 104 S.Ct. 2052. Hitchcock offers no authority indicating that exclusion from bench conferences is an additional exception to the general prejudice requirement, and we have found none.
[14] During a penalty phase, any "evidence which the court deems to have probative value may be received ... provided the defendant is accorded a fair opportunity to rebut any hearsay statements." § 921.141(1), Fla. Stat. (Supp.1996). This Court has consistently held that a party is not accorded a fair opportunity to rebut hearsay where the declarant is deceased and thus cannot be called as a witness. See, e.g., Blackwood v. State, 777 So.2d 399, 411-12 (Fla.2000) (holding that trial court did not err in excluding hearsay testimony because State had no fair opportunity to rebut statements of deceased victim). Because Hitchcock did not raise irrebutable hearsay as a possible ground for objecting to Driggers' testimony before the circuit court or on appeal to this Court, we do not address whether the victim's statements were admissible in the instant case.
[15] Section 921.141(5)(d), Florida Statutes (1977), lists "rape" as an enumerated felony for purposes of that aggravating factor. This terminology is not an issue in the present action. The crime of "rape" was called "sexual battery" in 1977. See ch. 794, Fla. Stat. (1977) (Sexual Battery). Moreover, in the direct appeal from Hitchcock's latest resentencing, Hitchcock VI, 755 So.2d at 644, this Court upheld the trial court's finding of the murder in the course of a felony aggravating factor due to its previous rejection of Hitchcock's claim that sexual battery was improperly used as the underlying felony for that aggravator in Hitchcock I, 413 So.2d at 747.
[16] The trial court did not specify what year of the Florida Statutes it consulted. Any error is harmless because section 794.011(4)(c), Florida Statutes (1977), the statute in force at the time of Hitchcock's offense, includes similar language explaining that sexual battery occurs "[w]hen the offender coerces the victim to submit by threatening to retaliate against the victim, or any other person, and the victim reasonably believes that the offender has the ability to execute these threats in the future."
[17] To the extent that Hitchcock asserts that his resentencing counsel failed to argue generally that the State did not prove this aggravating factor, his claim is refuted by the record. Resentencing counsel did argue that the evidence did not support finding the factor. During closing argument, counsel pointed out to the jury that the medical expert had testified that the victim had no broken nails, no foreign matter under her nails, and no defensive wounds on her wrists or arms, all evidence suggesting that the sexual encounter may have been consensual.