FIRST DISTRICT COURT OF APPEAL
STATE OF FLORIDA
_____

No. 1D17-0691
_____

WILLIAM J. CORMIER III,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Escambia County.
W. Joel Boles, Judge.

August 3, 2018

ROBERTS, J.

The Appellant, William J. Cormier III, appeals from an order denying his postconviction motion brought pursuant to Florida Rule of Criminal Procedure 3.850. For the reasons discussed below, we affirm.

The Appellant was indicted by a grand jury for first-degree murder. The evidence presented at trial reflected that the victim was last heard from on August 27, 2012, when he called a family friend, Patricia Burke, from an unfamiliar number and made plans to meet her at 1:45 p.m. When she arrived at his home at 1:15 p.m., the Appellant was leaving the house. The Appellant told her that the victim was not home, his plans had changed, and he had been delayed. Ms. Burke expressed concern for the victim because he had been in poor health when she spoke to

him. After the Appellant left, Ms. Burke waited at the home, hoping to see the victim. The Appellant called her less than ten minutes later from the same number the victim had called from that morning. He told her that he had spoken to the victim, who would not be home for hours, and Ms. Burke should go home.

The evidence reflected that the victim had a collection of *Magic: the Gathering* cards worth between $50,000 and $100,000. Some of these cards were signed by the creator of the game. In particular, he had a Black Lotus card, which was described as "the number one card you can purchase," as it was an out-of-print card with a low print run. He also had rare cards such as a Time Walk and a Mox Ruby.

The weekend after the victim's disappearance, the Appellant attended a sci-fi convention in Atlanta, where he approached a pair of vendors with a valuable *Magic: the Gathering* card collection. The Appellant sold them some of the cards for $5,844. His twin brother, Christopher Cormier, was present during the negotiations, but did not participate or receive any money. After the convention, the Appellant, who did not own a car and had been driving a rental car provided by his father, paid cash for a Chrysler Sebring.

On September 3, 2012, the Appellant rented a U-Haul and storage unit in Florida and started emptying the victim's home. He hired a yard service to work on the yard and haul some items from inside the house to a landfill. He told the owner of the yard service that he owned the house and his renters had moved out. When a curious neighbor stopped by, he told the neighbor that the victim was moving in with him. While the Appellant was at the house, his brother, Christopher, injured his arm trying to push open a window, and the Appellant took him to the hospital. The Appellant returned without his brother and continued moving the victim's belongings. The Appellant paid the yard crew and arranged for people to clean the house. He also paid the cleaning crew.

On September 6, 2012, the Appellant emptied the storage unit. The Appellant's brother was present at the time, but unable to help due to his injured arm. The Appellant did not tell the

2

business that he was emptying the unit. It was discovered empty and unlocked during a walkthrough of the premises.

On September 7, 2012, Ms. Burke returned to the victim's house. There were no cars in his driveway, and the house was empty except for an old TV. The victim's father reported his son missing to law enforcement.

Subsequently, the Appellant arrived at his father's house in Georgia, driving a U-Haul. When he opened the back of the truck, his father noticed a horrible smell, like there was a dead animal inside. The Appellant told his father that a dog had died in Pensacola. Subsequently, the Appellant's father saw a number of *Magic: the Gathering* cards in the house. He also noticed his nephew digging in the backyard.

On September 8th or 9th, the Appellant helped make a barbecue pit in his father's backyard. He bought two-by-fours, stakes, cement buckets, and a mixer for the project. He built the frame and helped pour the concrete. He testified at trial that he had to do most of the work because his brother had hurt his hand.

On September 10, 2012, the Appellant met the two vendors from the sci-fi convention at a restaurant in Tennessee. They were meant to meet in Kentucky, but the Appellant's car broke down, so the location was changed. The Appellant and the vendors spent two to three hours haggling over *Magic: the Gathering* cards while Christopher watched and left periodically to smoke. The vendors paid $12,021 in cash for the cards, which included a Mox Ruby, a Time Walk, and a Black Lotus. The Mox Ruby card was signed by the creator of the game.

Afterwards, the Appellant's father picked up the Sebring in Tennessee. It ultimately required $2,000 in repairs, which the Appellant paid for. When the Appellant returned from Tennessee, he bought a BMW for $5,100. Later, one of the twins asked their father to throw away some spoons. He discarded them in a dumpster at a Sonic restaurant. He then received a phone call from a Pensacola detective about a missing person. He asked his sons what was going on, and one of them told him that they

would remove what was in the backyard. He believed it was the Appellant who said this.

On October 8, 2012, a search warrant was executed at the Appellant's father's home. Beneath a pile of leaves in the backyard, police discovered a concrete slab encased by wood. When the slab was lifted, they found a blue plastic tote. Inside the tote were human remains that were later identified as the victim's. The victim's skull had been shattered by blows that appeared to have been caused by a hammer. Stab wounds and cuts appeared to have been inflicted post-mortem. His body was wrapped in plastic, and there were multiple air fresheners, fragrance oils, and a bag of potpourri inside the tote with him. The spoons discovered inside the nearby Sonic dumpster were identified as the victim's antique spoon collection. Blood in the back of the U-Haul truck rented by the Appellant was matched to the victim.

When the brothers were taken into custody, Christopher simply told the detective that he had not seen the victim in over a month. Meanwhile, the Appellant admitted to the detective that he and his brother had stayed at the victim's home before attending the sci-fi convention and that he had later spoken to the victim by phone. He advised that the victim had asked for help moving to Cantonment. The Appellant claimed to have loaded the victim's belongings and left them at a house in Cantonment with a man named John.

The Appellant's defense at trial was to blame his brother for the murder and claim that several other witnesses were lying. According to the Appellant, his father lied about the smell coming from the U-Haul and about him promising to move what was in the backyard after the police called. The victim's neighbor lied about him saying that the victim was moving in with him, and the owner of the yard service lied about the Appellant representing himself to be the owner of the victim's house. The Appellant admitted to lying to Ms. Burke, but claimed that he did so because his brother showed him a note from the victim indicating that the victim had fled from his home out of fear of people who had previously attacked him. He acknowledged lying during his police interview about helping the victim move to

4

Cantonment, but claimed that his brother told him to do so while they were being arrested.

The Appellant claimed that he purchased the plastic tote, air fresheners, and tarp that were used to conceal the victim's body on his brother's instructions. He testified that he had to sell some of the victim's trading cards to pay for those items because he did not have enough money. He claimed that his brother showed him a note from the victim asking him to sell some of the trading cards due to the victim's financial problems. The Appellant indicated that it fell to him to sell the cards because he had ten years of experience selling *Magic: the Gathering* cards and kept himself apprised of the cards' prices. However, he denied knowing how valuable the victim's collection was until after he sold the cards. He testified that he packed up the victim's home and organized the cleaning and the yard work because his brother told him that the victim was moving.

At the conclusion of the trial, the Appellant was found guilty of first-degree murder and sentenced to life in prison. His conviction and sentence were affirmed on appeal. *See Cormier v. State*, 156 So. 3d 1076 (Fla. 1st DCA 2015). He then filed the instant rule 3.850 motion, raising seven grounds for relief. The lower court summarily denied the motion, and this timely appeal followed.

In the Appellant's first ground, he raised two subclaims. In subclaim (a), he argued that his attorney was ineffective for failing to investigate and present evidence that he participated in poker tournaments. He alleged that this evidence would counter the State's theory that he committed the murder for monetary gain due to his own poor financial situation.

A claim of ineffective assistance of counsel is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To prove ineffective assistance a defendant must allege 1) the specific acts or omissions of counsel that fell below a standard of reasonableness under prevailing professional norms and 2) that the defendant's case was prejudiced by these acts or omissions such that the outcome of the case would have been different. *Id.* at 690-92. The prejudice prong requires that the defendant demonstrate a reasonable probability that, but for counsel's

5

errors, the result of the proceeding would have been different. *See id.* at 694.

Here, the Appellant's trial counsel did present evidence regarding the Appellant's income at the time of the offense. The Appellant's father testified that the Appellant's primary form of income was from playing poker and that he was extremely good at it. He explained that the Appellant played in tournaments, standard cash games, and online poker games. The Appellant also testified that at the time of the offense, he was playing poker semi-professionally. He claimed that he did "extremely well" in tournaments and cash games. He further testified that he had purchased some *Magic: the Gathering* cards while attending a sci-fi convention in Indianapolis before staying at the victim's house. He indicated that he had earned money from selling those cards. During closing arguments, defense counsel stressed that while the State depicted the Appellant as being in poor financial straits at the time of the victim's murder, the Appellant had income from poker and from his trading cards and a paycheck waiting with his former employer back in Georgia.

Regardless, even if defense counsel had secured additional evidence regarding the Appellant's poker winnings, it would not have changed the outcome of the trial. The Appellant testified that he quit his job at Steak 'n Shake before the murder. He indicated during his police interview that he was unemployed. His father testified that the Appellant was unemployed from the time he went to visit the victim until the victim's body was discovered. Prior to the murder, the Appellant did not own a car, but was driving one his father had rented for him. The Appellant also testified that when he went to buy a plastic tote, some air fresheners, and a tarp at Wal-Mart on August 27, 2012, he did not have enough money for these items, so he had to sell some of the victim's trading cards to pay for them.

The Appellant bought the Sebring after selling the victim's trading cards, although he denied using the victim's money in that transaction. However, he testified that when the Sebring broke down, he had to borrow money from the victim to repair it. He claimed that his brother negotiated a deal with the victim via text messages that required him to sell the Sebring when he

returned to Georgia and use the proceeds to repay the victim and buy another car. Instead, he returned to Georgia and bought a BMW, but continued to drive the Sebring up until his arrest.

Given this information, it is clear that the Appellant was not in good financial condition at the time of the murder, regardless of any poker winnings. He did not own a car, could not rent one for himself, and could not afford to buy relatively inexpensive items at Wal-Mart without using the victim's trading card money. By his own testimony, when the Sebring broke down, he could not afford to repair it. Under these circumstances, evidence of his poker winnings would not have disproven the financial motive for the victim's murder. Therefore, this subclaim was properly denied.

In subclaim (b), the Appellant argued that his attorney should have investigated and obtained records that would prove that he had given his father money to pay for the rental car. He alleged that his father did not have the income to pay for the car and that the utilities at his father's home were in the Appellant's name as well. He asserted that this would have undermined the State's evidence that he committed the murder for financial gain. He claimed that this would have changed the outcome of the trial. He also argued that this evidence could have been used to impeach his father's testimony.

This subclaim was properly denied for the reasons already discussed in connection with subclaim (a). By the Appellant's own testimony, at the time of the murder, he did not have the money to pay for air fresheners, a plastic tote, and a tarp. He was later unable to pay for the repairs to his Sebring without borrowing money. Evidence showing that he was helping to pay for a rental car and utilities would only have suggested an additional drain on his financial resources at the time. Therefore, there is no reasonable probability that this evidence would have changed the outcome of the trial.

In the Appellant's second ground, he argued that his attorney was ineffective for failing to call his nephew, Kirk Moksnes-Adamson, to testify at trial. He alleged that Mr. Moksnes-Adamson would have testified that Christopher asked him to dig the hole in the backyard where the victim's body was

ultimately discovered. He asserted that this testimony would have created a reasonable doubt as to the Appellant's involvement in the murder.

The Appellant cannot show prejudice. Insofar as he suggests that this testimony would have implicated his brother in the murder, the evidence presented already established his brother's involvement. However, it also established that all of the actions taken to conceal the victim's death and dispose of the victim's property were taken by the Appellant. The Appellant admitted at trial that he lied to Ms. Burke about the victim's whereabouts when she came looking for the victim. He did not testify that his brother told him to lie to Ms. Burke, but indicated that he lied because the victim had fled his house out of fear of some people who had "jumped" him and he did not want to tell Ms. Burke the victim's business.

The Appellant subsequently bought the tarp, tote, and air fresheners used to dispose of the victim's body. He rented the U-Hauls and the Florida storage locker that were used to transport and store the victim's body and belongings. He negotiated the sale of the victim's trading cards and received the proceeds. He lied to the victim's neighbor about the victim moving in with him and lied to the yard crew about being the owner of the victim's house. Even after his twin hurt his arm and the Appellant took him to the hospital, the Appellant returned to the victim's home and continued moving the victim's belongings. He paid for yard work and cleaning services at the victim's home.

After driving the U-Haul to his father's house, it was the Appellant who explained the smell from the truck. He admitted at trial that he bought the supplies and did most of the work building the barbecue pit that was used to conceal the victim's body. After the Appellant was arrested, he lied to the detective about helping the victim move. While he claimed that his twin told him to tell that story when they were being arrested, Christopher did not tell the detective the same story. Instead, Christopher would only say that he had not seen the victim in over a month.

The Appellant also appears to be the only one who benefitted from the sale of the victim's trading card collection. He bought

8

the Sebring and the BMW after selling the cards and admittedly used money earned by selling the victim's cards to pay for the repairs to the Sebring. No evidence suggested that his brother bought anything with the trading card money.

By contrast, Christopher's contributions to the murder appear to be his initials on a rental agreement for a Georgia storage unit and possibly a request to their father to throw away the victim's spoon collection. Otherwise, Christopher was either passively present during the events while the Appellant did the talking or was not present at all. Furthermore, their father testified that he used to tease the Appellant that he was the husband and his brother was the wife because the Appellant was the "lead twin." Additionally, after the Appellant was arrested, he wrote his father a letter from jail threatening to commit suicide and stating, "I just feel like this is my only choice and if we go to trial, they will go after Chris, too. I will not let that happen. He would not have been in this situation if not for me." Under these circumstances, additional evidence of Christopher's involvement would not have resulted in the Appellant being acquitted at trial.

In the Appellant's third ground, he argued that his attorney was ineffective for failing to file a motion to suppress his statements to the police on the basis that they were made before he was read his *Miranda*[1] rights. He alleged that he was prejudiced because the prosecutor relied on these statements during trial to depict him as untruthful.

Even assuming that defense counsel's performance could be considered deficient in this regard, given the evidence discussed above, there is no reasonable probability that the outcome of the trial would have been different if the statements had been suppressed. He did not incriminate himself during the interview, and there was overwhelming evidence of his guilt. Furthermore, suppression of his statements would not have prevented the prosecutor from depicting him as untruthful. The evidence reflected that the Appellant lied to Ms. Burke about the victim's whereabouts, to the detective about helping the victim move to

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

9

Cantonment, to his father about the smell coming from the U-Haul, to the yard crew about owning the victim's home, and to the victim's neighbor about the victim moving in with him. Therefore, this ground was properly denied.

In the Appellant's fourth ground, he argued that his attorney was ineffective for failing to object to the introduction of the victim's autopsy photos. He alleged that the photos were irrelevant and prejudicial, as they only served to trigger an emotional response in the jurors.

"Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (2012). "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." § 90.403, Fla. Stat. (2012). "Photographs are admissible if they assist the medical examiner in explaining to the jury the nature and manner in which the wounds were inflicted." *Ault v. State*, 53 So. 3d 175, 198 (Fla. 2010) (internal citations omitted). "Moreover, photographs are admissible to show the manner of death, location of wounds, and identity of the victim." *Ault*, 53 So. 3d at 198 (internal citations omitted).

Here, the photographs were introduced to show how the victim was discovered, wrapped in a tarp inside a plastic bin with numerous air fresheners. This tended to connect the Appellant to the offense due to his admitted purchase of the tarp, plastic bin, and air fresheners on the last day anyone heard from the victim. The photographs were also used to explain the blunt force and sharp force injuries to the victim's head and neck that ultimately caused his death. The medical examiner testified that the photographs would help her explain the type and number of wounds and their location. Additionally, she used the photographs to explain how she determined what type of weapon was used to kill the victim. Lastly, the State introduced photographs to show how the victim was dressed at the time of his death, which was relevant given the question as to when the victim was killed. Under these circumstances, any objection by defense counsel would have been overruled, as the photographs were relevant and that relevance was not outweighed by their prejudicial value. *See Hitchcock v. State*, 991 So. 2d 337, 361 (Fla.

10

2008) ("Counsel cannot be deemed ineffective for failing to make a meritless objection.").

In the Appellant's fifth ground, he argued that the cumulative effect of counsel's errors in grounds one through four denied him a fair trial. However, because those individual claims of error are meritless for the reasons discussed above, any claim of cumulative error must also fail. *See Barnhill v. State*, 971 So. 2d 106, 118 (Fla. 2007) ("Because all of the allegations of individual legal error are without merit, a cumulative error argument based upon these errors must also fail.").

In the Appellant's sixth ground, he argued that the State committed a *Brady*[2] violation by withholding evidence from the defense. The Appellant alleged that surveillance videos that were introduced at trial depicted him renting and returning U-Haul trucks at two different locations. He asserted that if the entire second video was shown instead of the edited version, it would have shown that his father and niece accompanied him to the U-Haul facility, thereby undermining his father's trial testimony. He claimed that he did not have access to the entire second video prior to trial, but expressed his objection to his attorney to the edited version being shown both before trial and while the video was being played.

To establish a *Brady* violation, a defendant must show that: "(1) the evidence was either exculpatory or impeaching; (2) the evidence was willfully or inadvertently suppressed by the State; and (3) because the evidence was material, the defendant was prejudiced." *Davis v. State*, 136 So. 3d 1169, 1184 (Fla. 2014). However, "a *Brady* claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant." *Geralds v. State*, 111 So. 3d 778, 787 (Fla. 2010) (quoting *Occhicone v. State*, 768 So. 2d 1037, 1042 (Fla. 2000)).

---

[2] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963).

11

Here, the record reflects that the video was not edited, but fast-forwarded past irrelevant portions. This was done with defense counsel's consent. Furthermore, the Appellant's own allegations indicate that he was aware that there was additional footage in the video that was not played during trial. Under these circumstances, the existence of the full version of the second video is not *Brady* evidence, as it was known to the defense. Regardless, the Appellant cannot show prejudice in light of the evidence discussed above.

In the Appellant's seventh ground, he argued that his attorney was ineffective for failing to investigate a letter that Christopher sent to the prosecutor before trial. The Appellant alleged that in this letter, his brother took responsibility for the disposal of the victim's body and claimed the Appellant was not involved in transporting or hiding it. The Appellant asserted that his attorney declined to present the letter at trial due to his concern about statements coming in that his brother had made to the detectives. The Appellant indicated that these statements detailed how he stabbed the victim and chased him around the house before killing him with a hammer. The Appellant argued that these statements were easily refuted by the medical examiner's testimony that the stab wounds appeared to have been inflicted post-mortem. The Appellant alleged that this letter would have supported his reasonable hypothesis of innocence and the proceedings may have had a different outcome.

Even assuming that counsel can be deemed deficient for failing to introduce the letter, the Appellant cannot show prejudice. The Appellant does not suggest that his brother claimed responsibility for the murder in the letter, only the disposal of the body. Thus, this letter would not have proven that the Appellant was not responsible for killing the victim. Furthermore, in view of the evidence discussed above, there is no reasonable probability that it would have changed the outcome of the trial.

AFFIRMED.

ROWE and WINOKUR, JJ., concur.

12

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____


William J. Cormier III, pro se, Appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, for Appellee.